## SUSAN JENESON, Admx., etc.

### *v.*

## ROBERT J. JENESON *et al.*

1. ESTOPPEL—*to avoid act, by procuring it to be done and sharing in benefits derived from it.*  Where the wife and children of a person then in advanced years, counseled and assisted in procuring such person to convey his real estate to a son, so as to enable the latter to raise money, by his mortgage on the same, of an innocent party, who did no act, or even counseled the adoption of the course pursued, and the money thus raised was invested in the purchase of a homestead for the father, which the children inherited after his death:  *Held,* that the heirs and the widow, to whom most of the heirs conveyed after the father's death, were estopped from defeating the lien of the mortgagee by insisting that the father was mentally incapacitated from entering into the arrangement by which the money was obtained, they not being under any disability, and not claiming that they did not fully understand the arrangement.

2. PROMISSORY NOTE—*remedy on, when in equity.*  Where a son, in consideration of the conveyance of land to him, gave his notes for the price, payable to the heirs at law of his father in a certain time after the death of his father and mother, the interest to be paid annually for the support of the father and his wife:  *Held,* that the heirs, by the form of the notes, were at least equitable holders, and, inasmuch as the' maker was also a payee, their payment could only be enforced in a court of equity.

3. ASSIGNMENT *of note—when void by reason of mental incapacity to make assignment, subject to equitable defense.*  Where a father, being physically and mentally weak, and incapable of managing his farm and affairs in a proper manner, by the advice and consent of all the members of his family, conveyed his farm and property to a son, taking notes secured by a mortgage on the land, the notes payable to his heirs at a certain time after his death and that of his wife, the interest payable annually for their support, and placed the same in the ·hands of another son with whom he made his home, and such son, without the consent of the other heirs, surrendered these notes, taking in lieu thereof two other notes, payable to the father, secured by a mortgage, and induced the father to indorse one of them, and then sold the same, and afterwards sold the other, indorsing his father's name thereon as agent, it appearing that the father, at the time of such transfers, was *non compos mentis*:  *Held,* on cross bill by the holders of these notes, that the assignment was void by reason of the mental incapacity of the assignor, and the holders took the same subject to all defenses existing against them; and that, as equity looks to the substance rather than the form, the new notes so taken, except as to the maker,

260      JENESON, ETC. *v.* JENESON *et al.*      [Sept. T.

Opinion of the Court.

and the son who transferred them, would be treated as belonging to the heirs at law of the father the same as the original notes.

4. EQUITY *only regards substance.* Equity only regards substance, without being trammeled by mere forms. So, where notes secured by mortgage were given payable to the heirs of a party after his death, and one of the heirs having possession of the same, by an arrangement with the maker, substituted other notes in lieu of the same, also secured by mortgage: *Held,* that the first notes were a lien upon the mortgaged premises in favor of each of the heirs, to the extent of their several interests in the same, and that the parties making the change were powerless to deprive them of that interest without their assent; and that such change in the form of the evidences of the indebtedness without their authority or ratification, in nowise affected their lien on the land, or their right to enforce it in equity.

5. PARTY IN CHANCERY—*foreclosure of mortgage.* Where a mortgage was given to secure notes payable to the heirs of a certain person after his death, and after the death of such person all his heirs, except one, conveyed to his widow their interest in the mortgaged premises: *Held,* upon cross bill to foreclose a prior mortgage given by the same mortgagor, that such heir who had not conveyed to the widow was a necessary party to the cross bill.

6. Where a mortgagor had sold and conveyed a portion of the mortgaged premises before bill filed to foreclose the mortgage: *Held,* that the grantee was a necessary party defendant to the bill.

APPEAL from the Circuit Court of Will county.

Mr. GEO. HERBERT, for the appellant.

Mr. T. L. BRECKINRIDGE, for the appellees.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This was a suit in equity, brought by Robert Jeneson, in his lifetime, in the circuit court of Will county, against Thomas H. Jeneson, Jeremiah J. Cole, A. B. Hall, T. Dalson and Robert J. Jeneson, for the purpose of setting aside a conveyance made by him to his son Robert J. Jeneson, and to cancel a mortgage and a number of promissory notes executed to him as a part of the consideration on the purchase of certain lands embraced in the deed.

It appears that complainant, at the time he executed the deed of conveyance, was advanced in years, and had become physically and mentally weak, and incapable, in a proper manner, of conducting his farm and general business and of providing and caring for his family; that about the 29th of March, 1856, all of the members of his family came together, and, after consultation, they entered into an arrangement that complainant should convey his farm and real estate to his son Robert, who was to take the same with the personal property on the farm, and pay therefor $4500; to pay in hand $1000, and give his seven promissory notes for $500 each for the balance, payable to the heirs or executors of complainant; the notes to become due severally in from one to seven years after the death of complainant and his wife; the notes to bear ten per cent interest from date, payable annually, and Robert J. to execute a mortgage on the land to secure the payment of the notes. The deed, notes and mortgage were executed according to the arrangement.

It was further agreed that Robert J. should borrow the $1000, to make the cash payment, and execute a mortgage on the farm to secure the lender. It was found that George Gorden would make the loan, and on the same day that complainant conveyed the premises to Robert J. he borrowed the money from Gorden and executed to him a mortgage on the farm to secure its payment, and that mortgage was recorded before that given by Robert J. to his father.

It also appears to have been a part of the arrangement agreed upon by the family that Thomas H. Jeneson, another son of complainant, should, with the money thus obtained of Gorden, purchase a small house in the village of Oswego, for a residence for complainant and his family, which he did, and the family removed to and occupied it until and after the death of complainant. The notes, with the mortgage executed by Robert J. to complainant, were placed in the hands of Thomas, who was to collect and apply the interest to the support of complainant and his wife.

About the 14th day of June, 1857, Thomas, it seems, went to Robert J. and induced him to execute two notes, one for $1500 and the other for $2000, the first due in one year and the other in ten years from date, and to execute a mortgage on the farm to secure their payment, both notes and mortgages payable to their father, and Thomas then surrendered the seven notes, and the mortgage given to secure their payment, to his brother Robert.

Afterwards, Thomas induced his father to indorse the $1500 note in blank, and, being in embarrassed circumstances financially, to raise means to meet his own indebtedness, he sold the note to Theophilus Dalson, who was subsequently made a defendant by an amended bill. Afterwards, complainant having died, the suit was revived in the name of Susan Jeneson, his widow, who had become administratrix of his estate.

By supplemental bill, it appeared that all of the heirs of Robert Jeneson, deceased, except Elizabeth, had conveyed all of their interest in their father's estate to Susan Jeneson, his widow and their mother, who is the complainant prosecuting this suit.

Gorden filed a cross bill to foreclose his mortgage, and Dalson likewise filed a cross bill to foreclose to the extent of his interest in the mortgage given by Robert to his father, held by the assignment of the $1500 note sold him by Thomas. To avoid the foreclosure of these mortgages, the mental incapacity of Robert Jeneson deceased is set up and relied upon by answers.

Thomas, subsequently to the sale of the $1500 note to Dalson, sold the $2000 note to Asher Hall for about $700 or $800, and endorsed it to him, in his father's name, by himself as his father's agent, and delivered the note to Hall.

On a hearing in the court below, a decree was rendered for the foreclosure of the Gorden and Dalson mortgages, but relief was refused to Hall on his cross bill, which was dismissed. The decree finds that Gorden's mortgage was a prior lien, and that Dalson held a junior lien for the $1500 note, and the

land was ordered to be sold for the payment of these sums, and the surplus, if any, was ordered to be paid to the administratrix, and the $2000 note held by Hall be surrendered up and canceled. The record is brought to this court and a large number of errors are assigned, a portion only of which we deem it material to discuss.

It is first urged that the deed conveying the premises from Robert Jeneson to his son Robert was void, because, at the time of its execution the maker was mentally incapacitated for the transaction of business, being incapable of comprehending the nature of the transaction, or the effect it was to have.

It is manifest from the evidence that the conveyance and the notes and mortgage given by Robert to his father, as also the loan of the $1000 by Gorden and the mortgage executed to him, were all done in pursuance of an arrangement entered into by the family, who are the widow and heirs of Robert Jeneson, deceased. The heirs were not under disability, and it is not claimed that they did not fully understand the arrangement when it was entered into by them. It was intended to and did accomplish their deliberate purpose. They, by the arrangement, obtained Gorden's money, and it was appropriated by them to the purpose for which it was designed, and, so far as we can see, they have inherited the house and lot in Oswego, which it purchased. Having participated in the arrangement, and having accomplished their purposes from its consummation, they have not the slightest ground of complaint against any one, much less Gorden, who did no act to induce them to adopt the course pursued, and they must be held estopped from repudiating the transaction. It would be a fraud on Gorden, after their father's death, to permit them, on inheriting his property, to defeat Gorden's rights and avoid an act they were the active agents in consummating.

They consented to, and aided and assisted in procuring the conveyance from their father to Robert J., and in obtaining the money from Gorden, when they were fully cognizant of

their father's mental condition, and must be held estopped from now urging his mental incapacity to perform the act they induced. To permit them to do so would be a fraud on Gorden that equity could not sanction. And this seems to have been the view taken of the case by the solicitor who drafted the original bill, as Gorden was not made a party to it, nor is there any prayer that his mortgage be canceled. And inasmuch as the heirs were estopped from questioning the transaction, and from avoiding the conveyance, Mrs. Jeneson, as their grantee, having received a conveyance from the heirs with a full knowledge of the circumstances, can occupy no better position in a court of equity than did her grantors. She, having notice, succeeded only to their interest as they held it at the time they conveyed to her. She must be held estopped to question Gorden's mortgage as a valid lien on the property. But Elizabeth, not having conveyed her interest in the mortgaged premises to her mother, as did the other heirs, holds such an interest in the lands as renders her an indispensable party to Gorden's cross bill. Any decree the court could render in foreclosing his mortgage would not affect her title to the premises. For the reason that she was not a party to that bill, the decree foreclosing Gorden's mortgage was erroneous, and must be reversed.

We now come to the consideration of Dalson's claim. It appears from the evidence, quite satisfactorily, that Robert Jeneson, deceased, was mentally incapacitated from transacting business when these transactions occurred. The evidence preponderates decidedly in favor of his insanity. This being so, he was incapable of executing any instrument that would bind him, or confer any rights on the person to whom it was made. Being *non compos mentis* when he executed the assignment of the note under which Dalson claims, it was void, and he acquired no title. If, then, Dalson received the note without assignment, or, what amounts to the same thing, with a void assignment, he holds the note subject to all defenses existing against his title to the note.

The notes first executed by Robert J. to his father, to secure which he executed the first mortgage, were payable to the heirs of his father, after his death, but the interest to be annually paid for the support of the father and his wife. Thus it appears that the heirs of Robert Jeneson, deceased, were intended to be and were in fact made the payees of the notes, including Robert J. Jeneson. They, by the form of the notes, were at least equitable holders, inasmuch as Robert, the maker, was also a payee, and their payment could only be enforced in a court of equity. These notes were secured by a mortgage, which could only be enforced in equity, but it was a lien on the land in favor of each of the heirs of Robert Jeneson, deceased, to the extent of their several interests in the seven notes; and Thomas and Robert J. were powerless to deprive them of that interest without their assent; and the attempted change of these securities from the seven notes due in from one to seven years after their father's death, to the two notes due at specific dates, and taking the new mortgage, without the consent, authority or ratification of the other heirs, in nowise affected their lien on the land or their right to enforce it in equity. The transaction was but a mere unauthorized change of the form of the arrangement, but not its substance as to all, except it may be as to Thomas and Robert J. Jeneson.

Equity only regards substance, without being trammeled by mere forms. Dalson having taken the note without a valid assignment, it is, in his hands, in the same condition as if he had taken it without any, even the form of an assignment, or had taken a note over due subject to equities and defenses with which it was charged. Whether Robert J. is liable for its payment, or the interest he held in the land is liable, by putting the note in circulation and making the new mortgage, are questions which were not raised in argument, and are not decided. Hence, Dalson acquired, by his purchase from Thomas, of the note, no rights against any of the heirs, unless it be Thomas and Robert. Thomas is not a party

to the proceeding, and should be to Dalson's cross bill if it is intended to be urged that he, by assigning the note to Dalson, thereby gave a lien on his interest in the seven notes given by Robert J. on the purchase of the land.

Whether the heirs have transferred their interest in the estate to their mother, as is alleged, their several interests, either in their hands or their mother's, unless it be that of Thomas and Robert, are not liable to the payment of the notes held by Dalson and Hall, and the decree of the court below was erroneous in ordering the sale of the interest previously held by the heirs generally to satisfy Dalson's note.

If there has been a failure to revive the original bill, the amended bill, or the cross bills, as is urged, the court below can, on application for the purpose, make the requisite and formal orders. If service has not been had on any party, that can be made before another trial. Objections have been urged against the decree on these several grounds, but as the decree is reversed for other reasons, and as counsel can readily determine whether they exist, we have not deemed it important to examine whether these objections are well taken; and if they are, they can be readily obviated.

It appears from the answer of Robert J., that he had, before Dalson filed his cross bill, sold twenty acres of the land embraced in the mortgage to his father, to Mary S. Herbert. This, then, made it necessary that she should have been made a party, inasmuch as she would have a right to be heard whether she shall be required to redeem from Dalson and Hall's liens, if they hold such on the land, or any interest therein, and whether she purchased subject to this last mortgage. She also had the right to be heard whether the first mortgage was a subsisting lien as against her. For these reasons she was a necessary party before a full and final adjustment of the equities of all parties could be made. Thomas was a necessary party, that he might be heard on the question whether his interest in the fund had not passed to the purchasers of

the notes, subject to Gorden's mortgage, and whether, by selling these notes, he did not render himself liable to answer to the purchasers of the notes for the amount thereof.

For the various errors indicated the decree of the court below is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

*Decree reversed.*