## Shipman Banking Company, Appellee, v. Edward Douglas et al., Appellants.

1. EVIDENCE, § 202*—*when declarations of party in disparagement of title to property are admissible.* While declarations made by one in disparagement of his own title to property made subsequent to a transfer thereof cannot be admitted as against his assignee or grantee, still any such declaration made during his ownership is admissible as against such assignee or grantee.

2. INSANE PERSONS, § 5*—*when evidence is sufficient to show insanity of assignor of note.* On a bill to foreclose a mortgage and cross-bill to have pretended assignments and transfers of the note secured by the mortgage by an alleged incompetent person and by the assignee to a complainant canceled and a new note and mortgage substituted, evidence *held* sufficient to show mental incompetency and insanity at the time of the assignment of the note.

3. INSANE PERSONS, § 4*—*when burden of proof is on complainant to cross-bill to show execution of assignment of note by assignor at lucid interval.* On a bill to foreclose a mortgage, and cross-bill to have set aside pretended assignments and transfers of the note secured by the mortgage by an alleged incompetent person to the first assignee and to complainant canceled and a new note and mortgage substituted, where the proof showed that the assignor was practically insane both before and after the assignment, and there was no proof that such insanity was of a temporary character or that the cause of the mental derangement was violence, or temporary illness, *held* that the burden of proving that the assignor had lucid intervals and that the assignment was executed at a lucid interval was upon complainant.

4. INSANE PERSONS, § 54*—*when assignment of note is void.* The assignment without consideration of a note by an insane person who is unable to comprehend the nature of the transaction is void.

5. INSANE PERSONS—*when innocent purchaser not protected.* A court of equity will protect the interests of the estate of an insane person who, without consideration, assigns a note to another, even against an innocent purchaser of the note from such assignee.

Appeal from the Circuit Court of Macoupin county; the Hon. FRANK W. BURTON, Judge, presiding. Heard in this court at the October term, 1915. Reversed and remanded with directions. Opinion filed July 14, 1917. *Certiorari* denied by Supreme Court (making opinion final).

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

**Statement by the Court.** On November 29, A. D. 1911, James Metcalf *et al.*, partners doing business as The Shipman Banking Company, filed their bill in the Circuit Court of Macoupin county making Edward Douglas and his wife, Ethel M. Douglas, parties defendant, to foreclose a mortgage on certain real estate given to secure a note for the principal sum of $10,332.80, executed by Edward Douglas and payable to the order of Ella Miles. The bill avers that Ella Miles on a blank day indorsed and delivered the said note to one W. W. Rhoads by means whereof the said Rhoads then and there became the legal owner thereof and of said mortgage securing the same, and that afterwards, to wit, on the 27th day of July, A. D. 1911, the said Rhoads then being the legal holder and owner of said instruments, indorsed and delivered the same to the complainants who, by virtue thereof, then and there became and still are the legal holders and owners of the note and mortgage.

On the 19th day of December, A. D. 1911, the same complainants filed another bill in the Circuit Court in which Annie Burgoyne and Edward Douglas are made parties. This latter bill, after setting out the filing of the former bill, further avers that said Annie Burgoyne in the month of October, 1911, was appointed conservatrix of the estate of said Ella Miles on the ground that she was a feeble-minded person; that said Annie Burgoyne qualified as such conservatrix and is now acting in that capacity; that on or about the 14th day of December, A. D. 1911, the said conservatrix without any lawful warrant or authority therefor, and in violation of the rights of complainants as the legal owner of said note and mortgage, satisfied said mortgage of record in the office of the recorder of deeds of said county. The bill prays that said release of said mortgage be canceled and removed and for naught held as against the rights of the complainants; that the

mortgage which is now in full force and effect, may be foreclosed as prayed for in the original bill; that Annie Burgoyne may be enjoined from disposing of any money that she may have received from Edward Douglas or any other person on account of said indebtedness, and that she and Edward Douglas may be required to fully set forth the nature and effect of all transactions had between them concerning the matter of said indebtedness, etc.

On April 27, 1912, these two bills were consolidated and on August 3, 1912, Annie Burgoyne, as conservatrix of the estate of Ella Miles, a feeble-minded person, by leave of court filed her cross-bill making the partners of the Banking Company parties defendant thereto, and averring that for a year prior to the filing of the first bill mentioned, and from thence hitherto, said Ella Miles, on account of her mental weakness, was incapable of transacting ordinary business and had not sufficient mental capacity to sell, assign, transfer or otherwise dispose of said note and mortgage when it is claimed said note was assigned to said Rhoads; that said assignment to Rhoads was invalid and of no legal effect and is a fraud upon the rights of her said ward; that said ward received no consideration for the pretended assignment of the note, if any was made, and the transfer thereof to Rhoads was a pure gift without consideration while said ward was a feeble-minded person and without mental capacity to understand the transaction; all of which facts the said James Metcalf, who was cashier of said bank and who negotiated with Rhoads for the pretended purchase of said note, and who purchased the same from Rhoads for the bank, had full knowledge; that after her appointment as such conservatrix she made diligent search for said note and could not locate the same; that before its maturity she procured the execution and delivery to her, as such conservatrix, of a new

note and mortgage in payment of the note and mortgage mentioned in the bills filed by complainants and thereupon released the original mortgage of record which was then and there in her possession as such conservatrix; that she now holds said new note and mortgage as part of the assets of the estate of her said ward. The cross-bill prays that the pretended assignments and transfers of the note to Rhoads by Ella Miles and to the said bank by Rhoads to be set aside and canceled and held for naught as against said Ella Miles, on account of her mental incapacity to assign the note and the fraud perpetrated upon her in procuring and disposing of the note by Rhoads; that said note be decreed paid and canceled by the new note and mortgage herein above referred to, etc.

Issues were joined upon the consolidated bills and cross-bill and the cause referred to the master in chancery, who, after hearing the testimony of a large number of witnesses, reported, among other things, that the testimony taken on behalf of the conservatrix shows that during the summer and fall of 1911, and perhaps earlier than that, she was, on the occasions testified to, in a state bordering on idiocy or complete imbecility and that this testimony is strong and convincing; that, on the other hand, witnesses of equal credit, testified to facts and circumstances during this same period showing her to be in full mental capacity; and lays particular emphasis on the facts that in the spring of 1911, Mrs. Miles had an attorney prepare a power of attorney making Rhoads her attorney in fact, and she had another attorney draw a will for her, and that these attorneys testified that she was at such times, respectively, of sound mind. He further reports that he is unable to reconcile this conflicting testimony except upon the theory that the mental derangement mentioned by the witness was intermittent and that there were lucid intervals; that the burden

of proof was on the conservatrix to prove that Mrs. Miles was mentally deranged and that the indorsement and delivery of the note to Rhoads was not at a time when she had a lucid interval; that Rhoads not being a party to the suit, conversation had by him with witnesses prior to the alleged assignment were incompetent evidence as against the bank; that the sharp question is presented, whether the bank shall lose all the money that it invested in this note, or whether Mrs. Miles should lose it, or be remitted to any remedy she may have against Rhoads; that during the pendency of this proceeding Mrs. Miles has departed this life and the case for that reason is somewhat simplified because should the conservatrix here prevail, it would be only for the benefit of the heirs of Mrs. Miles, and the welfare of Mrs. Miles need not longer be considered; that it would not be equity in this case to make the bank lose its investment only to enrich the heirs of Mrs. Miles; that the equity is with the complainants in the original bill; that the amount due on the note is $8,705.63, and recommends a decree foreclosing the original mortgage for said amount.

This report was approved by the chancellor and a decree entered setting aside the release of the original mortgage executed by the conservatrix and ordering a foreclosure of the original mortgage. The decree also further provides that the second mortgage executed by Edward M. Douglas and his wife to Annie Burgoyne as such conservatrix, after making of such release, is wholly null and void and of no binding force or effect, and the same should be and is by this decree canceled, and for naught held.

THOMAS RINAKER and S. GILSON BROWN, for appellants.

EDWARD C. KNOTTS and PEEBLES & PEEBLES, for appellees.

Shipman Banking Co. v. Douglas, 206 Ill. App. 586.

MR. JUSTICE ELDREDGE delivered the opinion of the court.

Mrs. Ella Miles on the death of her husband in 1903 became the owner of one hundred and sixty acres of land near Miles Station, Macoupin County, Illinois. In 1906 she sold the farm to Edward Douglas, taking in part payment therefor a note from Douglas for the principal sum of $10,332.80, payable in five years and secured by a mortgage on the land. In 1909, Douglas paid $3,000 on this note and with this money Mrs. Miles bought a house for a home in Alton, where she lived until the spring of 1911, when she went to live with W. W. Rhoads at his home in Brighton, and there resided until September, 1911, when she went to the home of Annie Burgoyne. On July 27, 1911, Rhoads, who owed the appellee bank over $5,000, which indebtedness had been placed in judgment, assigned this note to the bank in part payment thereof. The note at this time bore the indorsement signed by Ella Miles, "Pay to the order of W. W. Rhoads." Rhoads at this time was also indebted to a man by the name of Stewart to the amount of $1,700, evidenced by a note secured by a mortgage on his farm. Before the assignment of the note in controversy to the bank by Rhoads, the latter informed Metcalf, the cashier, that Mrs. Miles had given him the note and that he did not have the mortgage securing the same because he could not find it. The bank after consultation with its attorneys accepted the note, paid Rhoads' indebtedness to Stewart and applied the balance on his indebtedness to the bank, which satisfied the same within $300, for which balance Rhoads executed a new note payable to the bank.

On October 2, 1911, Mrs. Miles was found upon inquest to be a distracted person and Mrs. Burgoyne was appointed conservatrix of her estate. The conservatrix in taking charge of the property of her ward

found a note for the sum of $100 payable to Ella Miles and executed by Rhoads; $100 in cash deposited in an Alton bank, some other personal property, and also the Douglas mortgage, but failed to find the note which the mortgage secured. On November 22, 1911, she procured the execution by Douglas and his wife of a new note for the principal amount of the balance due on the original note, payable to her as such conservatrix, and also a new mortgage to secure the payment of this note, and released the original mortgage.

The testimony of a large number of disinterested witnesses produced on behalf of appellants shows conclusively that at the times, at least, of the incidents of which they testified, Mrs. Miles was not only feeble-minded for a year or more prior to the spring of 1911, but absolutely insane, and we agree with the master that this proof "is strong and convincing." We do not agree with the master that the proof introduced on behalf of appellees is as convincing or entitled to the same weight as that introduced on behalf of appellants. We will state our reasons for this conclusion by briefly commenting upon the testimony of the more important witnesses who testified on behalf of appellees that Mrs. Miles was mentally sound. Francis Mayerhofer knew nothing of her condition since November, 1909. W. H. Goodell knew nothing of her business capacity since 1906 or 1907, and had only greeted her once since that time, which was in 1910, to ask about her health. D. M. Blodgett, who is connected with a bank in Brighton, testified that Mrs. Miles had been a depositor in that bank from 1907 to 1911, and that she closed her account in the spring of 1911; she had drawn no checks against it for several years and there was no change in it for two years before 1911; she had done no business with the bank for two years before 1911 except to sign notes as surety for Rhoads; that he is interested with Rhoads

in some timber lands and Rhoads was then indebted
to the bank.  J. W. Darlington had not seen her since
she went to live with Rhoads and had only met her once
or twice since 1908.  James Barber had no knowledge
of her since the spring of 1909.  Albert Gent testified
that he was an intimate personal friend of Rhoads and
was in the latter's home at least four times a week
from the time Mrs. Miles came there in May, 1911,
until September or October of that year; he and
Rhoads had dealings together in the prop business;
that Rhoades brought Mrs. Miles to live with him
after he saw in the St. Louis paper that she had been
wandering away; that when she came to live with the
Rhoads in May she was capable of transacting busi-
ness and continued to be competent to do so all the
time she was there.  Ella Boyle testified that she was
the matron of the Alton Woman's Home; that between
the middle of July and August, 1911, Rhoads and his
wife, Gent and Mrs. Miles visited the Home and stayed
about an hour.  She detailed no conversation had
with Mrs. Miles, but says she gained the impression that
Mrs. Miles intended to leave something to the Home,
and Rhoads was the only one who said anything about
Mrs. Miles entering the Home as an inmate; that from
what she saw of Mrs. Miles at that time, she was not
insane.  L. D. Yager, attorney at law, testified that
on some day in May, 1911, Mrs. Miles came to his
office in the morning with a woman she introduced
as her niece, asked to have him draw her will and told
him what she wanted therein; that she returned in
the afternoon and executed the will; he does not
recall who were the witnesses nor what were the con-
tents of the will but believes at that time she was
competent to transact ordinary business.  He further
testified that this took place about a week or ten days
before he read in the newspaper of the Belleville inci-
dent.

The Belleville incident mentioned by the witnesses is only one of the many acts of more or less similar character testified to by the witnesses produced on behalf of appellants and is the only one that will be referred to, as no good purpose would be served in detailing all the deplorable manifestations of mental weakness testified to in regard to this unfortunate woman. ˙ The Belleville incident is uncontroverted, was published in the press, is a matter of public notoriety and stands unquestioned. Rev. A. D. Lindsay, a witness for appellants and a minister in Belleville, testified that on May 11, 1911, he was called to the police station in said city where he was informed there was a lady whose name was Mrs. Miles of Alton; that she was absolutely devoid of mind and everything seemed a blank to her; he tried to talk with her for over two hours but could get very little response from her; she had some letters and newspaper clippings, one clipping she said related to the funeral of her husband, another announced the marriage of her daughter, Edna Miles, and was signed by her father; she said that the man mentioned in the clipping was her husband; the announcement was about a month old and when he asked her how her husband, who had been dead ten years, could announce his daughter's marriage a month ago, she said she couldn't tell, she didn't know; that when he asked her if this man was her husband and she her husband's second wife, she said yes, she had forgotten that; she said she lived in Upper Alton and she thought she was then in Peoria and said she never had been in Belleville; she said she did not know if she had any money, that she left home with $500; she had $208 in money with her; she carried a little market basket, two lady's large hand bags and a smaller one, and in the basket was an empty oatmeal box, empty tobacco boxes and little pieces of paper folded up; she wanted to give the children some

of these to put buttons in; she was very poorly dressed, very dirty and looked like a tramp; the police asked him to take her to Alton; he took her to his house and his wife bathed her and gave her dinner; he procured a neighbor lady to take her to Alton; the Edna Miles referred to in the newspaper was a daughter of a lawyer in St. Louis.

There is no evidence in the record tending to show that a woman of her age and thus mentally afflicted could within a week or ten days thereafter have sufficient mental capacity to make a will. The only evidence in regard to her execution of the power of attorney to Rhoads is by the witness John Brenholt, Jr., who testified that he was a stenographer in the law office of his father in Alton; that sometime between January and June 1911, Mrs. Miles in company with Rhoades, came to his father's law office and asked to have him draw an instrument making Rhoads her attorney; that his father dictated the power of attorney to the witness who wrote it out on a typewriter; that in his opinion Mrs. Miles was mentally competent at that time to transact business. The power of attorney was not introduced in evidence and the witness does not state what its contents were or what Rhoads was authorized to do by virtue thereof. Mrs. Miles had no business to transact with the exception of receiving the interest as it became due upon the Douglas note and the rent from her cottage at Alton. If she was of sound mind and capable of transacting the ordinary business affairs of life, there is no apparent reason shown in the record why she could not attend to these simple matters without the necessity of having some one act for her through a power of attorney. The will was not offered in evidence nor any testimony given as to its provisions, has never been offered for probate, and whether it still exists or in whose possession it may be does not appear. We do not think

the facts that Mrs. Miles, under the tutelage of Rhoads, executed the power of attorney to him when there was no apparent necessity therefor, or that she executed a will under the circumstances shown, are incompatible with the theory that she was mentally incompetent to transact the ordinary business affairs of life, or sufficient to rebut the positive evidence of her mental infirmity. The fact that she voluntarily assigned this note, which was substantially all the property she had, to Rhoads at her age and in her condition as a gift to him, and at a time when he was financially embarrassed and being pressed by his creditors, cannot be urged as a circumstance showing business acumen.

The witness Irving M. Clark testified that Rhoads told him in Alton on April 26, 1911, that he was looking after some business for Mrs. Miles; that she was in a very critical state mentally, was unable to attend to business and because of her mental condition, had gotten her business affairs in a very serious condition; that her mind was practically gone; that she had been found wandering on the streets of Alton; that a short time before she had lost a number of papers and that the note and mortgage that she held on property owned by Douglas were lost and he was making efforts to find them; that she had given him a power of attorney to transact all her business for her; and that she had made an agreement with him that at her death the mortgage was to go to him but that during her lifetime she was to receive the interest and on her death he was to have the benefit of the note. Thomas F. Chamberlain testified that he was cashier of the First National Bank at Belleville and met Rhoads in the bank about the middle of April, 1911; that Rhoads stated to him that he was looking after Mrs. Miles' business and that the mortgage was lost; that she was not capable of handling her business and he had a power of attorney and was look-

ing after it for her; that he didn't know where her papers were and did not know what to do about them; that she would mention papers and then not be able to find them. This witness further testified that about the 8th or 9th of June, 1911, Rhoads told him that he had some pretty good fortune; that Mrs. Miles had given him the $7,300 note on the Miles property. The witness asked Rhoads if he had ever found the mortgage and that Rhoads answered no; that Rhoads said that she had lived with him a long time, that she had some nieces down in Alton and she did not want them to have it, and that he thought that he was entitled to it on account of the fact that she did not want them to have it; that she had given it to him; and that she was the owner while she lived and it was to go to him after her death. Both of the above witnesses were disinterested and wholly worthy of credit, and their testimony shows conclusively that Rhoads secured the assignment of this note to him by Mrs. Miles when she was mentally deranged and incapable of transacting business. Several other witnesses testified to conversations had with Rhoads in or about this same period of time, wherein Rhoads stated, in substance, that Mrs. Miles was "crazy" and was unable to transact any business and that she had given him this note and mortgage. The master and chancellor refused to consider any of this evidence on the grounds that Rhoads was not a party to the suit and that such statements by him were incompetent as against the bank. While the rule is that declarations, made by one in disparagement of his own title to property made subsequent to a transfer thereof, cannot be admitted against his assignee or grantee, still any such declaration made during his ownership is admissible as against such grantee or assignee. *William v. Judy*, 8 Ill. (3 Gilm.) 282; *Sandifer v. Hoard*, 59 Ill. 246; *Hanchett v. Kimbark*, 118 Ill. 121; *Ander-*

son v. *South Chicago Brewing Co.*, 173 Ill. 213; *Gage v. Eddy*, 179 Ill. 492; *First Nat. Bank of Monmouth v. Strang*, 138 Ill. 347. The evidence of the witnesses Clark and Chamberlain, at least, was clearly competent, as it tended to show that Rhoads admitted that the note in question was assigned to him as a gift by Mrs. Miles without consideration and while she was insane, and consequently he had no valid title to it.

The proof shows that Mrs. Miles was practically insane both before and after her assignment of the note to Rhoads, and there was no proof that such insanity was of a temporary character or that the cause of the mental derangement was violence, or temporary illness. Under these conditions the burden of showing that Mrs. Miles had lucid intervals and that the assignment of this note was executed by her at a lucid interval was upon the appellees, and there is no such proof in the record. *The James White Memorial Home v. Haeg*, 204 Ill. 422; *Taylor v. Pegram*, 151 Ill. 106.

The proof conclusively shows that Rhoads procured the note from Mrs. Miles while she was mentally incompetent to understand the nature of the transaction.

The assignment of the note to Rhoads by her is therefore void. *Jeneson v. Jeneson*, 66 Ill. 259.

In the case of *Jordan v. Kirkpatrick*, 251 Ill. 116, the court quoted, with approval, the following expression announced in the case of *Dickerson v. Davis*, 111 Ind. 433: "The protection of persons who are so unfortunate as to be bereft of reason and incapable of managing their own estates is of higher obligation and an object more to be cherished by the courts than is the protection of holders of commercial paper, however innocent they may be." If the bank is an innocent purchaser of this note without knowledge of Mrs. Miles' mental condition, which in our opinion is doubtful, it is unfortunate, but a court of equity cannot sanction such looting of the estate of an insane per-

son as is shown by the record in this case. The fact that Mrs. Miles has died since the institution of these proceedings gives appellees no greater rights than they had before her death.

The decree of the Circuit Court is reversed and the cause remanded with directions to dismiss the original bills for want of equity and to enter a decree in arcordance with the prayer of the cross-bill of appellants.

*Reversed and remanded with directions.*